Derek I. TOLBERT, Plaintiff–Appellee,

v.

QUEENS COLLEGE, The City University of New York, Professor Stuart Liebman, Professor Helen Smith Cairns, and Professor Eric Gander, Defendants,

Queens College, The City University of New York, Professor Stuart Liebman, Professor Helen Smith Cairns, Defendants–Appellants.

Docket No. 98–7272

United States Court of Appeals, Second Circuit.

Argued Nov. 2, 1998.

Decided Jan. 15, 1999.

Frederick K. Brewington, Hempstead, NY (Adrienne Brewington, Hempstead, NY, on the brief), for Plaintiff–Appellee.

Marion R. Buchbinder, Asst. Atty. Gen., New York City (Dennis C. Vacco, Atty. Gen. of State of New York, John W. McConnell, Deputy Solicitor General, Robert A. Forte, Asst. Atty Gen., New York City, on the brief), for Defendants–Appellants.

Before: KEARSE and POOLER, Circuit Judges, and POLLACK, District Judge. *.

Judge POLLACK dissents in a separate opinion.

KEARSE, Circuit Judge:

Defendants Stuart Liebman and Helen Smith Cairns (collectively "appellants"), *et al.,* appeal from an order of the United States District Court for the Eastern District of New York, Reena Raggi, *Judge,* denying their motion, based on their assertion of qualified immunity, for summary judgment dismissing the complaint of plaintiff Derek Tolbert brought principally under 42 U.S.C. § 1983 (1994) and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1994), alleging that appellants discriminated against him on the basis of race. The district court denied the motion on the ground that the qualified immunity defense could not be decided without the resolution of material issues of fact as to the conduct in which appellants had engaged. On appeal, appellants argue that they were entitled to summary judgment on the ground that the undisputed facts show that they did not engage in the allegedly unconstitutional conduct and that it was objectively reasonable for them to believe that their conduct did not violate clearly

---

* Honorable Milton Pollack, of the United States District Court for the Southern District of New  York, sitting by designation.

established constitutional rights. For the reasons that follow, we dismiss the appeal for lack of appellate jurisdiction.

## I. BACKGROUND

Tolbert is a black citizen who since 1985 has been employed as a teacher in the New York City school system. In 1989, in order to maintain his teaching eligibility and to qualify for certain promotions, he enrolled in the Media Studies program ("Media Studies") offered by the Queens College Department of Communications Arts and Sciences (the "Department"), seeking a Master's degree in communications. In June 1993, having completed his course work with a satisfactory grade-point average, he sat for the comprehensive examination that was a prerequisite for that degree. He was given a failing grade and was therefore denied the degree. Liebman was a professor who gave Tolbert a failing grade on the examination.

### A. *The Explanations and the Lawsuit*

After learning that he had failed the examination, Tolbert sought an explanation, and Cairns, Chairperson of the Department, convened a meeting in October 1993, attended by, *inter alios,* Tolbert, Cairns, and Liebman. Also attending were Binnie Meltzer, who was a teaching colleague of Tolbert's, and Diane Peritz, an Adjunct Lecturer in the Department who took notes. The precise statements made at that meeting are in dispute. Tolbert asserts that he was informed that there were no objective criteria for the grading of the comprehensive examinations, and that Liebman stated that Chinese students and others for whom English is a second language ("ESL students") were graded on a basis different from the basis on which Tolbert was graded. The meeting notes taken by Peritz include the following statement attributed to Liebman: "We cut slack.[ ] We have Chinese ESL students and we allow for that."

The meeting did not result in any change in Tolbert's grade. Tolbert was informed that, in accordance with Department policy, he would be allowed to take the comprehensive examination a second time. He elected not to do so, and he did not receive a Mas-

ters degree in communications. He went on to earn a Masters degree in English. In 1994, he brought the present suit against Liebman, Cairns, and others, alleging racial discrimination in the grading of his examination.

To the extent pertinent to this appeal, Liebman and Cairns moved for summary judgment dismissing the complaint against them in their individual capacities on the grounds that they did not meaningfully distinguish between ESL students and others and that it was objectively reasonable for them to believe that their conduct did not violate clearly established constitutional rights. They contended, *inter alia,* that all examinations were made anonymous before being graded ("blind grading"), so that the professors grading a given examination had no information as to which candidate had written the examination. In support of the motion, Liebman submitted an affidavit stating that because Tolbert had not been a student in any of his classes, Liebman had no familiarity with Tolbert or Tolbert's handwriting before grading the examinations; hence Liebman did not know he was grading the examination written by Tolbert and could not have intentionally discriminated against Tolbert. Liebman stated further that Tolbert misconstrued the statements Liebman made about Chinese ESL students at the October 1993 meeting:

[T]here is no merit to plaintiff's allegations that "Chinese students" and unidentified "others" ... received preferential treatment in connection with the evaluation of their essays. It is my understanding that plaintiff bases this allegation on his totally incorrect interpretation of notes that were taken during the meeting held on October 6, 1993.

16. Those notes, which do not represent a verbatim account of the October 6, 1993 meeting, were taken by Ms. Diane Peritz, an adjunct Lecturer in the Department of Communications Arts and Sciences, and contain an isolated reference to "Chinese ESL Students."

17. Any reference that I made to "Chinese ESL Students" was in an effort to explain to plaintiff that foreign speaking

students, such as Chinese students, are permitted to bring language dictionaries to the comprehensive examination. However, Chinese students, like any other students in the Media Studies program, were not afforded any special accommodation or latitude with respect to the grading of their comprehensive examination.

(Affidavit of Stuart Liebman dated June 16, 1997, ¶¶ 15–17.) Cairns submitted an affidavit stating that she did not precisely recall Liebman's statements at the October 1993 meeting, but that Tolbert misconstrued them. She also expressed the view that a certain amount of preferential treatment for Chinese ESL students was appropriate:

9. In the complaint, plaintiff alleges that Professor Liebman advised him that Chinese students and unidentified "others" were graded on a "different basis" than he was which resulted in the application of discriminatory grading standards in an evaluation of his comprehensive examination.... It is my understanding that plaintiff bases this allegation on the notes of the October 6, 1993 meeting which were taken by Adjunct Lecturer Peritz. More specifically plaintiff focuses on a reference Professor Liebman may have made regarding "Chinese students" or other non-native speaking students, where English is their second language. ("ESL Students").

10. Notwithstanding the fact that I have no specific recollection of any comments made concerning Chinese or ESL students, it would be entirely appropriate not to penalize such students merely because their essay responses may have contained grammatical flaws. As I testified earlier in my deposition, it is often very difficult for ESL students to remember to always include the appropriate articles in their writing.... In evaluating the essays of the comprehensive examinations, the faculty graders focus on content, organization and argumentation and minimize the importance placed on grammatical errors.

11. Indeed, it is for that very reason that ESL students are permitted to bring a dictionary to the comprehensive examination.

12. Any random comment that Professor Liebman may have made concerning ESL students' lack of mastery of the English language has been totally misconstrued by plaintiff and does not substantiate plaintiff's allegation that he was subjected to a discriminatory grading system.

(Affidavit of Helen Smith Cairns dated June 11, 1997, ¶¶ 9–12.)

In opposition to the summary judgment motion, Tolbert submitted a statement of material facts that he contended were in dispute ("Local Rule 56.1 Statement"), in which he, *inter alia*, questioned the assertion that Liebman could not identify Tolbert's examination due to the blind-grading procedure. Tolbert stated that "considering the small number of people taking the exam," Liebman might well have been able to distinguish Tolbert from students whom Liebman had taught (Tolbert's Local Rule 56.1 Statement ¶ 18); he argued that, given the evident recognizability of the examinations written by Chinese ESL students, Liebman could have known, by process of elimination, which examination had been written by Tolbert.

Tolbert submitted a declaration in which he disputed appellants' description of the October 6, 1993 meeting:

11. The defendants ... contended that a lack of clarity in my writing was a significant factor in my failing the Masters Examination. In response to this comment, I opined that I write better than some of the Chinese ESL students in the class who passed the exam. This statement stemmed from my observations of the Chinese students in my class, many of whom appeared to have trouble expressing themselves and communicating clearly in [E]nglish.

12. When I asked Professor Liebman how my writing could have warranted a failing grade when compared to the Chinese ESL students in the class, he responded that "we cut slack" to the Chinese ESL students. Professor Liebman further explained how the graders allow for special and different treatment for Chinese ESL students, when reviewing the clarity and writing of their exams, because they "did

not know the language as well." Such leniency was in no way stated to be restricted to grammar, as contended later on in Professor Cairns' affidavit.

13. Professor Liebman expressed the point that such "slack" and consideration was *not* given to me in reviewing my writing, and that writing was one of the criteria for my failing grade. To be clear, I had never asked for such leniency, but only inquired as to whether such favorable treatment was being given to Chinese ESL students. Such favoritism is evidenced by the defendants' claim that I failed the exam for my writing, while I had known several Chinese ESL students in the class who appeared to have trouble with their writing and [E]nglish communication skills.

14. The transcript of the meeting from October 6, 1993 inaccurately placed Professor Liebman's comment about "cutting slack".... [T]he transcript omitted all of the conversation about my writing which immediately proceeded [*sic*] the comment that "we cut slack," and allow for special consideration of the Chinese ESL students in their writing.

15. While Professor Liebman claims that his comment was referring to allowing [E]nglish dictionaries at the exam for Chinese ESL students, this was not the reason stated to me at the meeting. Specifically, no conversation about Chinese students using [E]nglish dictionaries ever occurred.

(Declaration of Derek Tolbert dated July 21, 1997, ¶¶ 11–15 (emphasis in original).)

Tolbert also submitted a declaration by Meltzer, who had actively participated in the October 1993 meeting at which Liebman referred to Chinese ESL students. That declaration stated, in pertinent part, as follows:

5. At this meeting, Mr. Tolbert discussed his grade on the Comprehensive Exam for the Masters Degree, and expressed his belief that several of the Chinese "ESL" students most probably had written a poorer exam than he did, and yet they received passing grades while he failed.

6. Professor Liebman agreed with Mr. Tolbert's above-stated belief, and volunteered the additional information that because such students were ESL students, the Department "cut them some slack." Professor Liebman further stated that the graders took the Chinese ESL students' status into account during the grading of their writing and of their exams. This was the sole and only context during which the phrase "cut some slack" was used.

(Declaration of Binnie Meltzer dated July 22, 1997, ¶¶ 5–6.) Meltzer sharply disputed any assertion that the "cut some slack" phrase "was used to refer to the permitting of [C]hinese-[E]nglish dictionaries, or at any other time or in any other context." (*Id.* ¶ 6.)

■ We note parenthetically that, in this Court, appellants challenge the sufficiency of these declarations to defeat a summary judgment motion because they were not affidavits and Tolbert and Meltzer stated merely that they "duly swor[e]" to the contents, rather than that they swore "under penalty of perjury." We reject appellants' challenge, since we see no indication in the record that this objection was made to the district judge, who, as indicated in Part I.B., plainly took the declarations of Tolbert and Meltzer into account.

## B. *The Denial of Summary Judgment*

In a decision from the bench, the district court denied appellants' summary judgment motion on the ground that there were genuine issues of fact to be tried, both as to whether in fact there had been any racial discrimination and, if there had been, as to the precise scope and nature of that discrimination. The court stated that answers to these questions were essential both for a decision on the merits and for a resolution of appellants' claims of qualified immunity. The court stated:

I understand that the defendants point out that these exams are graded blindly, but the plaintiff has tried to suggest that professors can tell, from these distinctions in the way English as a Second Language students use language, when they're dealing with someone who fits into that category and when they're not. And that seems

to raise factual questions to me that I can[ ]not resolve.

(Hearing Transcript, February 10, 1998 ("Tr."), 6.) When counsel for appellants proceeded to argue that the grading system was in fact "uniform[ ]" and that "stylistic and grammatical errors would not penalize any of the candidates," including Tolbert (Tr. 7), the court stated,

> Well, you can argue that to the jury, but that doesn't appear to be what [Liebman] said. He said ... not that all students were cut slack in terms of the clarity of their expression or their writing; it's that Chinese E.S.L. students were cut some slack. That's what the plaintiff bases his case on.
>
> MS. DELL [Counsel for appellants]: Chinese or E.S.L. students. And if he had been within that category and, for any reason, if he had any kind of deficiency in his grammar or syntax, he would have been afforded that same latitude in the same way that the Chinese or E.S.L. students, if they did not present a coherent argument that was organized and had the necessary criteria for supporting a question, they would not pass.
>
> THE COURT: Well, you see, there's where it gets confusing with ... Meltzer's submission because [s]he says that the 'cut slack' referred to special and different treatment for Chinese E.S.L. students when reviewing the clarity and writing of their exams. And then we get into that very gray area of, Is clarity a function of the misuse of words alone where a reader still understands the point; or is it that the whole point has now become muddled and not clear?
>
> The issue for this Court is not whether or not it would agree with how this exam was graded; it's whether the school has established ... different criteria for Chinese E.S.L. students than it has for others and whether that's based in part on the race of those individuals or their ethnicity.
>
> I think it may be a very weak case for plaintiff, I have to say that, but I'm not sure I can grant summary judgment. A whole lot has to be resolved from hearing these people. It may very well be that the

jury is totally persuaded that the blind nature of this exam couldn't have penalized Mr. Tolbert at all, but I don't think I can grant summary judgment.

(Tr. 8–9.)

With respect to appellants' counsel's contention that Tolbert had produced no evidence of discriminatory intent on the part of Liebman, the court stated as follows:

> The statement that "We're going to favor Chinese students["] suggests that race or ethnicity is going to play a part in a decision.[ ] That's where we start. That's the basis of the plaintiff's claim that at least Professor Liebman has acknowledged that Chinese students are going to be graded on a different standard than presumably blacks, whites, others who don't fit that ethnic criteri[on]. That's the inference he's asking the jury to draw from Professor Liebman's statement.
>
> MS. DELL: Well, again, Your Honor, the statement was not a verbatim transcript of what was said—
>
> THE COURT: That's why we've got to get a factual hearing.

(Tr. 10.) The court also pointed out that although Cairns had not been a grader of Tolbert's examination, she, as Department chairperson, "could have ordered the exams to be reviewed again according to a nondiscriminatory standard." (Tr. 12.)

With respect to the assertion of qualified immunity, the court stated:

> [T]he reason I am not dismissing on qualified immunity ground is I do think that there are factual issues that could affect any immunity decision.
>
> I mean I am not having it argued to me by anyone that this was part of an affirmative action policy in favor of Chinese or Asian candidates and that the law on affirmative action has not been clear or was not clear. That's not the argument here. The argument is that there was no discrimination.
>
> If a jury were to find that there were discrimination, exactly what it found could inform whether qualified immunity was appropriate here or not, so I think this is one of those cases where it has to go forward,

**138**

and the qualified immunity issue can[ ]not be resolved before trial.

(Tr. 14.)

## II. DISCUSSION

Liebman and Cairns seek review of the district court's denial of their motion for summary judgment, arguing that they did not engage in the allegedly unconstitutional conduct and that it was objectively reasonable for them to believe that their conduct did not violate clearly established constitutional rights. Given the ground of the district court's denial of summary judgment, we dismiss the appeal for lack of appellate jurisdiction because that denial is not immediately appealable.

A district court's denial of summary judgment is ordinarily not an appealable "final decision" within the meaning of 28 U.S.C. § 1291 (1994). *See generally* 15B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3914.28, at 210–11 (2d ed. 1992) ("An order denying summary judgment ordinarily is not final, whether the summary judgment would dispose of the entire case or would merely resolve particular issues or claims." (footnote omitted)). Accordingly, a district court's ruling that there is sufficient evidence to warrant a trial as to whether the defendant engaged in the alleged conduct is not is immediately reviewable. *See, e.g., Johnson v. Jones*, 515 U.S. 304, 319–20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (affirming dismissal of appeal by defendants who asserted that they had not participated in the use of force against the plaintiff, "hold[ing] that a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial"); *id.* at 308, 313, 115 S.Ct. 2151 (district court's determination that there were factual issues to be tried as to the " 'we didn't do it' " defense "was not a 'final decision' within the meaning of the relevant statute"); *In re State Police Litigation*, 88 F.3d 111, 122 (2d Cir.1996) ("a denial of summary judgment because of the existence of triable issues of fact with respect to the merits is not immediately appealable").

As an exception to the general rule that denials of summary judgment are not immediately appealable, the denial of a summary judgment motion that was based on a defense of qualified immunity is immediately appealable under the collateral order doctrine first set forth in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), if the district court has rejected that defense as a matter of law. *See, e.g., Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir.1990). Where, however, the district court has denied summary judgment because resolution of the immunity defense requires the adjudication of issues of fact that are inseparable from the merits, the denial is not immediately appealable. *See, e.g., Behrens v. Pelletier*, 516 U.S. 299, 313, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); *Johnson v. Jones*, 515 U.S. at 313, 115 S.Ct. 2151; *Mitchell v. Forsyth*, 472 U.S. at 528–30 & n. 9, 105 S.Ct. 2806; *In re State Police Litigation*, 88 F.3d at 124.

[D]eterminations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case; if what is at issue in the sufficiency determination is nothing more than whether the evidence could support a finding that particular conduct occurred, the question decided is not truly "separable" from the plaintiff's claim, and hence there is no "final decision" under *Cohen* and *Mitchell*. See [*Johnson v. Jones,*] 515 U.S., at 313–18, 115 S.Ct. 2151. *Johnson* reaffirmed that summary-judgment determinations are appealable when they resolve a dispute concerning an "abstract issu[e] of law" relating to qualified immunity, *id.* at 317, 115 S.Ct. 2151—typically, the issue whether the federal right allegedly infringed was "clearly established,". . . .

*Behrens v. Pelletier*, 516 U.S. at 313, 116 S.Ct. 834 (emphasis omitted). It is only where there is "a given (for appellate purposes undisputed) set of facts," that an immediate appeal may be taken, for in those circumstances, the appellate court can review the district court's determination of "the

purely legal issue what law was 'clearly established,' " *Johnson v. Jones,* 515 U.S. at 313, 115 S.Ct. 2151, and " 'need not consider the correctness of the plaintiff's version of the facts.' " *Id.* (quoting *Mitchell v. Forsyth,* 472 U.S. at 528, 105 S.Ct. 2806).

Accordingly, in *Lennon v. Miller,* 66 F.3d 416, 421–22 (2d Cir.1995), we concluded that the denial of the defendant's qualified-immunity-based summary judgment motion was immediately appealable because there was "no dispute about the material facts," *id.* at 418. In considering a similar motion in *Salim v. Proulx,* 93 F.3d 86, 90 (2d Cir.1996), we ruled that the denial was immediately appealable because, for purposes of our assessment of that defense, the defendant explicitly accepted the plaintiff's view as to the conduct in which he had engaged. *See id.* at 91.

In the present case, in contrast, the facts as to the conduct in which appellants engaged are sharply disputed, and there is no hypothetical assumption by appellants that they engaged in the conduct that Tolbert alleges. Although appellants argue that discrimination based solely on language does not violate any clearly established constitutional rights, there is a dispute as to whether that was the extent of their conduct, and the district court found that the statements attributed to Liebman by Tolbert and Meltzer could be interpreted by a rational factfinder as reflecting a grading policy designed to give preferential treatment to certain students at least in part because of their ethnic background. Appellants do not even remotely suggest that they would be entitled to qualified immunity if, in grading the examinations, they discriminated on the basis of race or ethnicity. Rather, their premise, like that of the petitioners in *Johnson,* is "we didn't do it."

The district court concluded that there was sufficient evidence to permit a jury to find that the conduct alleged by Tolbert had occurred. While expressing skepticism as to the likelihood of a verdict in Tolbert's favor, the court ruled that the testimony of Tolbert and Meltzer, along with the Department notes of the meeting, would be sufficient to permit a jury to resolve in Tolbert's favor the evidentiary dispute as to what Liebman had

said; to infer that Liebman had stated, in essence, " 'We're going to favor Chinese students' " (Tr. 10); to infer that that statement "suggest[ed] that race or ethnicity [wa]s going to play a part in a decision" (*id.*); and to find that "the school has established ... different criteria for Chinese E.S.L. students than it has for others ... based in part on the race of those individuals or their ethnicity" (Tr. 8–9).

As the court stated, these factual issues "could affect any immunity decision," for "[i]f a jury were to find that there were discrimination, exactly what it found could inform whether qualified immunity was appropriate here or not...." (Tr. 14.) Thus, the question of appellants' entitlement to qualified immunity can be resolved only upon a determination of precisely what conduct occurred. Under the above authorities, the district court's denial of summary judgment on the basis that the evidence is sufficient to support a jury's finding that appellants engaged in the conduct described by Tolbert is not immediately appealable.

## CONCLUSION

We have considered all of appellants' contentions in support of appealability and have found them to be without merit. The appeal is dismissed for lack of appellate jurisdiction. We of course express no view as to the merits of plaintiff's claim or appellants' affirmative defenses.

POLLACK, Senior District Judge, dissenting:

I respectfully dissent.

The plaintiff brought this suit because he was not granted a Master's Degree in Communications. He did not submit evidence that he was entitled thereto or that he failed to receive the degree because of illegal discrimination against him as a Black–American.

The district court should have granted the motion by defendants for summary judgment. In opposition to the motion, the plaintiff failed to submit any cognizable evidence which entitled him to have his examination papers marked "Pass" by the college review-

ers thereof. To the contrary, in the opinion of the several reviewers who read and evaluated the required papers, the substance of plaintiff's papers failed to respond properly and adequately to the matters to be covered and answered, and the reviewers had a right to believe that the plaintiff was not entitled on his submissions to the award of a Master's Degree thereon.

This was all explained to the plaintiff at the post-exam meeting attended by the plaintiff and his professors to discuss the substantive inadequacy of his test papers. He was given an opportunity, which he rejected, to try again and did not supply an explanation for or correct his deficiencies. He countered by saying that Chinese candidates had passed the exams, albeit with insufficient grammar and faults in writing English. He was not faulted on those superficial grounds in which slack was cut for Chinese applicants. The School was not obligated to award the Masters Degree demanded by the plaintiff, except on satisfaction of its substantive requirements. The plaintiff did not establish his satisfaction thereof or even attempt to establish entitlement to a degree on the basis of the answers he had submitted. The individual reviewers were entitled as a matter of law to the protection of qualified immunity from suits such as this based on the unanswered shortcomings of the responses to the exam questions submitted by the plaintiff.

The plaintiff, a troubled individual (as clearly established by his deposition), attributed the stamp of disapproval of his responses by self-evident routine assertions in his legal submissions. His testimony was only that there had been a longstanding prejudice against him. He asserted as legal cause for the suit that the defendants engaged in "[a] pattern over the years of constant ... harassment, vacillation, implicitness, [and] changes of assignment," Deposition of Derek I. Tolbert, dated July 21, 1997, at 125, and that they "discriminated against [him] at the outset, most of it racial, most of it for other reasons," *id.* at 126. However, plaintiff's answering documents on the motion for summary judgment were devoid of the slightest evidentiary backing of illegal prejudice against him from the start of his candidacy for the degree or at any time.

An award of a Master's Degree by an institution of higher learning cannot be claimed, as it is here, on the basis of inadequate and unacceptable exam papers or references to the foot-faults of other candidates. The school's opinion thereon of the adequacy of the submissions is controlling on a candidate, regardless of the origins of the candidate and language difficulties or proficiency in grammar or writing possessed by the candidate, whether of Chinese or Black–American extraction.

The district court lost sight of the relevant issue in this litigation, namely: did the exams submitted by the plaintiff satisfy the requirements of the donors of the degree? The school's views thereon, not those of the plaintiff, were controlling. The adequacy of the candidate's responses to the questions is not a matter for the determination of a jury, which cannot award the school's degree. The plaintiff's self-proclaimed sufficiency in English expression and grammar, as contrasted with that of unidentified Chinese candidates for whom the professors allegedly cut slack in connection with their English expression and grammar, did not excuse the particular and different substantive inadequacies of the plaintiff in his examination papers. Plaintiff suffered no damages; his papers were not faulted by the school because of the slack in expression cut for others, who were not identified or even shown to have participated in these particular examinations.

I would reverse and grant summary judgment for the defendants, or at least return the case to the district court for a more comprehensive review of the motion for summary judgment.